UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-60516-CIV-DIMITROULEAS/ROSENBAUM

CHRIST COVENANT CHURCH, a
Florida non-profit corporation,

                Plaintiff,

v.

THE TOWN OF SOUTHWEST
RANCHES, a municipality of Broward
County, Florida,

                Defendant.

_____/

## ORDER

       This matter comes before the Court upon Defendant Town of Southwest Ranches' Motion

to Compel Discovery from Plaintiff Christ Covenant Church [D.E. 67].  The Court has carefully

considered Defendant's Motion, Plaintiff's Response [D.E. 76], all materials submitted in support

thereof and in opposition thereto, and the case file.  Additionally, the Court has heard argument on

Defendant's Motion on June 18, 2008.  For the reasons stated below, the Court now grants in part

and denies in part Defendant's Motion.

### *BACKGROUND*

       Plaintiff Christ Covenant Church ("Church"), which is a non-profit corporation and church,

is located in the Town of Southwest Ranches.  D.E. 3, ¶5.  According to the Amended Complaint,

the Church conducts religious services and "engages in other activities for the purpose of preaching

the Christian gospel and allowing Church members and others to practice and sustain their religious

beliefs." *Id.* Defendant Town of Southwest Ranches ("Town") is a municipality created and existing under the laws of the state of Florida, and it has the authority to regulate and restrict the use of land within its borders, within the bounds of the law. *See* D.E. 23, ¶7.

The Church owns three contiguous parcels of real property within the limits and boundaries of the Town. D.E. 3, ¶10. On the property, the Church has a sanctuary where worship services are conducted. *Id.* at ¶20. In addition to the sanctuary, according to counsel for the Church, the Church maintains a smaller administrative-type building. Because the Church felt that it "needed additional space for Bible study, funeral and wedding receptions, community association meetings, meetings for women, men, youth and children, church leadership meetings, voting precinct, family activities, and other activities related to its religious practices," the Church decided to build a new facility on its property. *Id.* at ¶¶21-24. Towards that end, the Church made an application to the Town to allow the building to proceed. *Id.* at ¶27.

The Town Council held a hearing on the Church's application at a regular meeting of the Town Council on June 8, 2006. D.E. 3, ¶30. During the hearing, which was open for public comment, people spoke in favor of and against the Church's application. *Id.* at ¶30; D.E. 23, ¶30. Among other comments, some in attendance made the following remarks:

> There's currently unsatisfied liens on the property, according to Broward County records. The Church has not been a good neighbor. They haven't been truthful with the Town. We don't owe them anything, and I'm asking that the Council work with the neighbors who are here tonight opposing this. I know you're under certain laws that you have to comply with for approval on certain things like this, but if we can come up with some way to delay this approval, the neighbors would appreciate it.
>
> There is a lot of violations out there that code should be addressing. They're running a lot more than a church out of there and it's almost

> like Jehovah's Witnesses way out west.  The building was supposed
> to be, if I'm not mistaken, removed.  My concern is...they're really
> butting up to a tight residential area . . . maybe the residents and the
> church can get together and try to resolve their problems.  They
> definitely have some major problems out there and it is with the
> church and what they're doing out there.  If they expand and get
> bigger, it just gives them more room to operate, more people and
> more of what they're doing.  Similar to Jehovah's Witnesses, they
> just wanna make it bigger.
>
> It's been about two years ago, more or less, there was a church.  They
> wanted to move into our residential area, and it was further out to the
> south – down towards Sheridan.  We refused to let them do that, and
> that was great. . . .  Whatever you gotta do, be real hard-nosed about
> this.

Ultimately, the Town denied the Church's application, citing insufficient parking spaces.  *See* D.E.

3 at ¶35.

In view of the Town's decision, the Church filed the instant lawsuit, alleging violations of

the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000cc ("RLUIPA"), the First

and Fourteenth Amendments to the United States Constitution, Article 3 of the Florida Constitution,

and the Florida Religious Freedom Restoration Act of 1998, Fla. Stat. 761.01, *et seq.* ("FRFRA").

In the Amended Complaint, the Church explains that it filed the case because it "desires to develop

its property to better serve its congregation . . . ," and it describes the Town's rejection of the

Church's application as "an unwarranted burden upon the Plaintiff's freedom to exercise its

religion."   D.E. 3.   Additionally, the Church asserts that "[t]he Town's refusal to grant the

[a]pplication has and continues to impose a substantial burden upon the Plaintiff's religious

exercise[,]" and that "[t]he Town's refusal to grant the [a]pplication constitutes a substantial burden

upon the religious beliefs and practice of the Plaintiff."   *Id.* at ¶¶41, 54, 60, 67, 72.  The Church

further avers that its use of its land "arises from and is motivated by the religious beliefs of the

[Church], its congregants, and pastoral staff and is an important form of service to the community to spread Christian beliefs." *Id.* at ¶52.

During the course of litigation in this case, the Town propounded on the Church interrogatories that sought, among other information, the identities and home addresses of each member of the Church over the last three years. D.E. 67, p. 4. Another interrogatory asked, "With respect to the allegations contained in paragraphs 41 and 54 of the Amended Complaint, identify all members of the Church's congregation who you contend will be – or have been – substantially burdened in their religious exercise by the Town's denial of the Application." *Id.* Finally, a third interrogatory requested, "With respect to the allegations contained in paragraph 56 of the Amended Complaint, identify all members of the Church's congregation who you contend will be or have been unable to practice their religious beliefs by virtue of the Town's denial of the Application." *Id.* at p. 5.

The Church objected to these interrogatories "on the basis that [they seek] to discovery highly personal and private information not relevant to these proceedings and not likely to lead [to] the discovery of admissible evidence." D.E. 67, pp. 4-5. In addition, the Church complained that the Town "can only seek to annoy, embarrass, and harass the congregants of the Church by such request." *Id.*

Thus, on May 20, 2008, the Town filed its Motion to Compel, seeking answers to the interrogatories described above. D.E. 67. In support of its Motion, the Town argues that it needs the Church members' names so that the Town may test the veracity of the Church's allegations that the Church's current facility is inadequate to accommodate the Church's needs. *See id.*

The Church responds by invoking its First Amendment associational and religious rights, and

arguing that the Town has failed to demonstrate a compelling need for the information it seeks. Furthermore, the Church contends that the Town has not shown that it cannot obtain information sufficient to serve its purposes through means other than obtaining the Church's membership list and other requested information.

### *ANALYSIS*

The Court's consideration of Defendant's Motion begins with a review of the scope of permissible discovery under Rule 26(b), Fed. R. Civ. P. That rule provides, in relevant part, that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." R. 26(b)(1), Fed. R. Civ. P. The Advisory Committee Notes to Rule 26 indicate that "[t]he purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case." Adv. Com. Notes, 1946 Amendment, R. 26, Fed. R. Civ. P. (citations omitted). Indeed, the Advisory Committee Notes approvingly cite language from a case stating that "the Rules . . . permit 'fishing for evidence as they should.'" *Id.* (citation omitted).

The courts have long recognized the wide scope of discovery allowed under the Federal Rules of Civil Procedure. As the Eleventh Circuit's predecessor court noted,

> The discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystalize concise factual issues for trial. Properly used, they prevent prejudicial surprises and conserve precious judicial energies. The United States Supreme Court has said that they are to be broadly and liberally construed.

*Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304 (5th Cir. 1973)[1] (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947); *Schlagenhauf v. Holder*, 379 U.S. 104, 114-115 (1964)).

Of course, the scope of permissible discovery is not unbounded. Requested discovery must be relevant, and it must not impose undue burden or be unreasonably cumulative, under the tests described in Rule 26(b)(2)(C). Finally, even if the discovery sought satisfies all of these requirements, an opposing party may not be compelled to respond to it where the opposing party invokes and demonstrates the applicability of an appropriate privilege. The Court need not address these additional considerations, however, if Defendant cannot demonstrate the relevance of the information sought, as relevance serves as the gate through which all discovery requests must pass. Accordingly, the Court turns its attention first to Defendant's assertions of relevance. Only if Defendant can satisfy a showing of relevance under Rule 26(b) must the Court consider Plaintiff's claims of privilege and objections to the discovery Defendant seeks.

## 1.    Relevance

Essentially, the Town argues that it requires information regarding the Church's membership to test the veracity of the Church's claims, as set forth in the Amended Complaint. Specifically, the Town asserts that it is entitled to examine the Church's contention that the Town's denial of the Church's application burdens the Church's ability to practice its religion by depriving the Church of the means to develop sufficient facilities to carry out its mission. During the June 18th hearing on Defendant's Motion, the Church stated that this alleged harm has both current and future aspects to it.

---

[1]Pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

As it pertains to the present, the Church asserts that the current facilities are so inadequate that they simply cannot accommodate the Church's current programming needs.  In this respect, the Church indicates, for example, that it expects to offer testimony from the pastors, Church elders, or deacons that certain programs have been attended in numbers exceeding appropriate seating or other facility availability, and that individual events such as funerals and weddings have not been able to be scheduled on the first-choice dates of the involved Church members because of conflicts with other programming.  With regard to the future, the Church explains that its current inadequate facilities interfere with the Church's ability in the future to offer multiple programs simultaneously and otherwise limit the Church's programming options and congregational growth possibilities, thus hindering the Church's ability to fulfill its religious mission in the manner in which it deems appropriate.

According to the Town, because the Church has put these matters into issue, the Town must have the ability to investigate and otherwise inquire into the reliability of the Church's assertions. The Town claims it can do so only by obtaining the names of the Church members and conducting additional discovery such as depositions of those members.  The Court considers the relevance of the membership information to testing the veracity of the Church's claims of harm as they relate both the future and the present.

A.     **Claims of Harm Relating to the Future**

As discussed above, the Church states that it expects to present evidence from the Church's leadership attesting that the inadequacy of the Church's existing facilities interferes with the Church's ability to develop and offer new and additional programming.  The Town argues that it

should have the ability to discover and depose non-leadership members of the Church to ascertain whether, in fact, these individuals feel as though the Town's denial of the Church's application has burdened each of them with respect to future programming.  In this respect, the Town urges, the Church is comprised of its members, and it is the members' rights that the Church truly seeks to vindicate.  Hence, the Town concludes, the members' identities should be subject to discovery, and the members to deposition.

The Court disagrees with the Town's position.  The Church has its own separate corporate existence, independent of its members, and can experience its own constitutional and statutory injuries.  As the Eleventh Circuit noted in *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1305 (11th Cir. 2006) (citations omitted), "[C]orporations plainly possess the rights the Church asserted here: due process, equal protection, and the free exercise of religion."  In the instant case, the Church seeks to vindicate its own rights, not those of its members.

Towards this end, the Church contends that the Town has obstructed the Church's ability to determine its religious priorities and goals by limiting the Church's facilities to their current status. When it comes to such policy determinations on behalf of a church, "'whose voice speaks for the church' is *per se* a religious matter."  *Minker v. Baltimore Annual Conf. of United Methodist Church*, 894 F.2d 1354, 1356 (D.C. Cir. 1990).  As a religious matter, the Church's ability to direct who speaks on its behalf regarding policy determinations is protected by the church autonomy doctrine, which prevents excessive entanglement of the government in religious matters.  *See Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 655 (10th Cir. 2002) (the "church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity.") (citing *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94,

116-17 (1952)).

The Church in this case has stated that its pastors, deacons, and elders speak on its behalf. Thus, whether an individual member of the Church may or may not feel burdened by the Church's inability because of facility limitations to develop and offer the types and quantities of programming the Church wishes is simply not relevant to determining whether the Church in its own right is burdened. Moreover, even setting aside the church autonomy doctrine, as a practical matter, individual members may not have complete knowledge of the Church's plans for the future. Nor is it fair to expect them to be able to speak fully to the goals of the expansion and the policies and mission of the Church in seeking that expansion. Consequently, the Court finds no relevance to the Town's proposed line of inquiry into the Church's membership, at least as the interrogatories at issue relate to how the Town's denial of the Church's application burdens the Church's ability in the future to fulfill its religious mission.

### B.     Claims of Harm Relating to the Present

The Court next considers the relevance of the information the Town seeks about the Church's membership as it relates to the Church's contentions that it has offered programs where attendance has exceeded seating or other spacial availability, and that individual events have been unable to be scheduled on the participants' first-choice dates. Here, the Court reaches the opposite conclusion. With respect to the present claims, the Church offers purely *factual* evidence, as opposed to its *policy determinations*, in support of its claims. Such factual information should be subject to testing by the opposing party. For example, if the Church presents testimony that its Bible Study classes regularly have standing room only, discovery of the names of anyone in attendance at Bible Study classes

would be relevant in that it would enable the Town to follow up with others in attendance to see whether they could corroborate or refute the Church's factual claims in this regard.  Indeed, at the June 18th hearing, counsel for the Church conceded that the membership information would meet the relevancy requirement of Rule 26(b) if the Church chose to offer factual evidence pertaining to the lack of seating or other spacial availability experienced by the Church.

Of course, should the Church decide not to present such a theory, any relevancy of the membership information sought by Defendant would cease to exist.  At the hearing, however, the Church was not prepared to stipulate that it would not introduce such evidence.  Accordingly, the Court finds that the Town has satisfied Rule 26(b)'s relevancy requirement as the Town's discovery requests relate to obtaining information for the purpose of testing the veracity of the Church's factual assertions regarding attendance at current programming and unavailability of facilities for life events.

## 2.   __The Church's Claims of Privilege__

While the Town has demonstrated the relevancy of the membership information it seeks, the Church objects to responding to the interrogatories at issue, invoking its First Amendment associational and religious rights.  Freedom of association for the purpose of engaging in activities protected by the First Amendment, including, among others, speech, assembly, and the exercise of religion, is considered a fundamental right.  *Gary v. City of Warner Robins*, 311 F.3d 1334, 1338 (11th Cir. 2002) (citations omitted).  Thus, a qualified First Amendment associational privilege exists in the discovery context, potentially exempting a party from having to respond to infringing discovery requests.  *Wilkinson v. Federal Bureau of Investigation*, 111 F.R.D. 432, 436 (C.D. Cal. 1986) (citing *NAACP v. Alabama*, 357 U.S. 449 (1958); *Britt v. Superior Court*, 20 Cal.3d 844

(1978)).

### A.   <u>Invoking the Associational Privilege</u>

The party claiming the associational privilege – in this case, the Church, bears the burden of making a *prima facie* showing of infringement by the challenged discovery.   To satisfy this requirement, the Church need only demonstrate a "reasonable probability" that the discovery at issue would subject the Church's members to "threats, harassment, or reprisals from either Government officials or private parties.   The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. . . ." *Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (*per curiam*).   Moreover, in making a *prima facie* case of harm, the burden is "'light,'" in view of the "'crucial place speech and associational rights occupy under our constitution.'"   *Schiller v. City of New York*, 2006 WL 3592547, *5 (S.D.N.Y. 2006) (quoting *New York State Nat'l Organization for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989)).   Indeed, "[i]n all cases the presumption is that speech and association are privileged." *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1541 (11th Cir. 1985).

In the instant case, the Town seeks the identities of all members of the Church.   Courts have repeatedly held that the disclosure of an organization's membership list potentially implicates First Amendment associational rights. *See, e.g., NAACP v. Alabama*, 357 U.S. 449 (1958); *International Society for Krishna Consciousness, Inc. v. Walter Lee*, 1985 WL 315, *7-*9 (S.D.N.Y. Feb. 28, 1985); *Anderson v. Hale*, 2001 WL 503045, * (N.D. Ill. May 10, 2001); *Wilkinson*, 111 F.R.D. at 436-37; *International Action Ctr. v. U.S.*, 207 F.R.D. 1, 3 and 3 n.7 (D.D.C. 2002); *see also Adolph Coors Co. v. Movement Against Racism and the Klan*, *supra* (upholding and describing as "carefully

crafted" a discovery order precluding release of the membership list of the Movement Against Racism and the Klan).

Nor, as the Town suggests, does the fact that the Church is a religious organization regarded as "mainstream," as opposed to a group established for the purpose of advocacy of challenged ideas, necessarily alter the analysis. As the Supreme Court noted when referring to the "varied forms of governmental action which might interfere with freedom of assembly, . . . 'A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature.'" *NAACP*, 357 U.S. 462 (quoting *American Communications Ass'n v. Douds*, 339 U.S. 382, 402 (1950)). While the Town does not seek to require the Church members to wear armbands, of course, demanding that members of the congregation be identified as such to the governmental community division within which their church is located, for purposes of discovery, is at least somewhat analogous. Indeed, at least one court has observed,

> Fear of the consequences of the disclosure of one's religious affiliation may be palpable and real at a certain point in history. There is, therefore, in my view, implicit in the First Amendment's guarantee of religious freedom, the right to choose whether or not to disclose one's religious affiliation lest forced disclosure inhibit the free exercise of one's faith. I have to believe that, when a person provides her name and address to a church that has asked her to become a member, she reasonably expects that her name and address will be disclosed to other church members, used by the church to invite her to other church functions, and used to solicit her contribution to the church's financial welfare. There is nothing I know of in the American experience that suggests to me that by giving one's name and address to a church one thereby agrees to the publication of one's religious affiliation to the whole world.

*Johnson v. Washington Times Corp.*, 208 F.R.D. 16, 17 (D.D.C. 2002).

In addition to the concerns regarding forced disclosure of a religious organization's

membership in general expressed by the courts, the Church in the case at hand has submitted specific evidence of hostility against the Church by certain of the Church's neighbors.  At the Town meeting where the Church's application was considered, members of the Town's community vehemently expressed their unhappiness with the Church and its members, urging the Town to find a way to deny the Church's application ("Whatever you gotta do, be real hard-nosed about this.").  Moreover, a review of the video recording of the meeting reveals that remarks of this type were often met with approving applause from the audience, while silence greeted comments from Church members who chose to speak.  Under these circumstances, the Court finds that the Church has satisfied its burden to make a good-faith showing that a reasonable probability exists that disclosure of the membership list would chill the Church members' exercise of their First Amendment rights.

### B.      Compelling Need and the Balancing Test

Once the party invoking the associational privilege makes the required *prima facie* showing of infringement, the Court must determine whether the party seeking discovery has demonstrated a "compelling need" for the information sought, such that disclosure of the requested information warrants the infringement of the disclosing party's First Amendment rights.  *See Schiller*, 2006 WL 3592547 (citing *New York State National Organization for Women*, 886 F.2d at 1355)); *see also Int'l Society for Krishna Consciousness, Inc.*, 1985 WL 315, *8 (citing *Buckley v. Valeo, supra*; *NAACP, supra; Savola v. Webster*, 644 F.2d 743, 747 (8th Cir. 1981) (*per curiam*); *Britt v. Superior Court of San Diego County*, 20 Cal. 3d 844 (1978); *Black Panther Party v. Smith*, 661 F.2d 1243, 1266-68 (D.C. Cir. 1981).  In making this evaluation, the Court applies a balancing test.  Among other considerations, courts engaging in the balancing test have taken into account factors such as the following:

(1)     with regard to the "compelling need" demonstrated by the seeker of the information, whether the party requesting discovery has shown that the information is so relevant that it "goes to the 'heart of the matter,'" *Schiller v. Dinler*, 2006 WL 3592547, *6 (S.D.N.Y. Dec. 6, 2006) (quoting *Anderson v. Hale*, 2001 WL 503045, *4 (N.D. Ill. May 10, 2001));

(2)     the availability of the information from alternative sources, *Int'l Society for Krishna Consciousness, Inc. v. Walter Lee*, 1985 WL 315, *16 (S.D.N.Y. Feb. 28, 1985) (citing *Black Panther Party v. Smith*, 661 F2d 1243, 1264-66 (D.C. Cir. 1981), *vacated mem. sub nom. Moore v. Black Panther Party* and *Smith v. Black Panther Party*, 458 U.S. 1118 (1982)); *Wilkinson*, 111 F.R.D. at 436 (citing *Int'l Union, UAW v. Nat'l Right to Work Legal Defense and Educ. Fund, Inc.*, 590 F.2d 1139, 1152v (D.C. Cir. 1978)); *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987) (citing *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 438 (10th Cir. 1977));

(3)     the nature of the information sought, including the likelihood of injury to the association or its members, if the desired information is released, *see Grandbouche*, *supra*, 825 F.2d at 1466 (citing *Silkwood*, *supra*, 563 F.2d at 438); *Adolph Coors Co. v. Wallace*, 570 F. Supp. 202, 208 (C.D. Cal. 1983) (citing *Black Panther Party*, *supra*);

(4)     the requesting party's role in the litigation, *see, e.g., Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 714 (5th Cir. 1979); *Grandbouche*, 825 F.2d at 1467; *Nat'l Organization for Women v. Sperry Rand Corp.*, 88 F.R.D. 272, 275 (D.C. Conn. 1980); and

(5)     whether the disclosure sought constitutes "the 'least restrictive means' for accomplishing [the requesting party's] objectives, and will not unnecessarily sweep constitutional rights aside," *Adolph Coors Co. v. Wallace*, 570 F. Supp. at 208 (quoting *Int'l Union, UAW v. Nat'l Right to Work Legal Defense and Education Foundation, Inc.*, 590 F.2d at 1152-53)); *Wilkinson*, 111 F.R.D. at 436.

The Court evaluates each consideration in turn.

## 1.     *Compelling Need*

Not only must the party seeking discovery demonstrate a compelling need for the information, but it must further show that the requested information "bear[s] a 'substantial relation' to the disclosure sought." *Adolph Coors Co. v. Wallace*, 570 F. Supp. at 208 (quoting *Black Panther Party, supra*, at 1265-66). Here, the Church seeks relief under the RLUIPA. To succeed on its

claim pursuant to 42 U.S.C. §2000cc(a), the Church must demonstrate, among other factors, that the regulation at issue "substantially burdens religious exercise." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir. 2004).

Thus, the Town urges that it needs information regarding the Church's membership in order to have a means of testing the Church's factual contentions that the Town's denial of the Church's application imposes significant burdens on the Church in the present.  Because a showing that the governmental action at issue imposes a substantial burden on the exercise of religion constitutes a required element of a successful RLUIPA claim under Section 2000cc(a), the Court agrees with the Town that information allowing it to develop the means of challenging the Church's contentions regarding the burden imposed by the Town's denial of the Church's application is central to the pending case and satisfies the associational privilege's requirement that a requesting party make a "heightened showing of 'relevancy. . . .'" *See Adolph Coors Co. v. Wallace*, 570 F. Supp. at 208-09.

Moreover, the Court finds that discovering the identities of Church members bears a substantial relationship to enabling the Town to investigate the Church's claims.  Such information allows the Town to conduct its own independent inquiry into precisely how highly attended current church programming is.

**2.    _Availability of the Information from Alternative Sources_**

As to the availability of the information sought from alternative sources, the Church urges that the Town should be required to depose the deacons, clergy, and elders, the names of whom the Church was willing to provide to the Town, before the Court even considers allowing the Town to obtain its members' names.  While this approach has some intuitive appeal, as a practical matter, the Church has already stated that it intends to present evidence through the Church's leadership of the

present burden imposed by the Town's refusal to grant the Church's application.  In this regard, the

Church has indicated that it expects such evidence to demonstrate that the current facilities are not

sufficient space-wise to house the Church's present programming requirements, as programs are now

attended in numbers greater than the existing facility can accommodate.  Thus, we already have a

substantial insight into the expected content of the Church leadership's testimony.  And it is precisely

to have the means to challenge these otherwise untested, anticipated factual assertions that the Town

seeks to obtain the Church members' names.  Under these circumstances, the Court sees no utility

to requiring the Town first to incur the expense of deposing each and every member of the Church's

clergy, deacons, and elders before considering whether the Town may obtain the members' identities.

Nor can the Court conceive of any other means of obtaining information to enable the Town to have

a way to investigate the factual assertions of the Church, other speaking to individual Church

members.

**3.      _The Nature of the Information Sought_**

Here, the Town seeks the identities of the Church's members.  As discussed, _supra_, Courts

have repeatedly acknowledged the high sensitivity of an organization's membership list.  Thus, the

First Amendment interests attendant to the membership information requested by the Town enjoy

substantial deference.

**4.      _The Requesting Party's Role in the Litigation_**

Although the requesting party's role in the litigation is not outcome-determinative of its

entitlement to the information sought, courts have acknowledged that a requesting party's status as

a defendant should be considered.  As the Tenth Circuit noted, however, "'[W]hile the filing of a

lawsuit may implicitly bring about a partial waiver of one's constitutional right of associational

privacy, the scope of such "waiver" must be narrowly rather than expansively construed, so that plaintiffs will not be unduly deterred from instituting lawsuits by the fear of exposure of their private associational affiliations and activities.'" *Grandbouche*, 825 F.2d at 1467 (quoting *Britt v. Superior Court*, 20 Cal.3d 844 (1978) (*en banc*) and citing *Familias Unidas v. Briscoe*, 544 F.2d 182, 185-86, 192 (5th Cir. 1976)); *see also Nat'l Org. for Women*, 88 F.R.D. at 275 ("individuals have not completely sacrificed their privacy rights, simply by bringing this action").

In applying these principles, courts have determined what information a defendant needs in order to defend the plaintiff's claims against it.  In *Grandbouche*, for example, the IRS allegedly seized documents from the National Commodity and Barter Association ("NCBA"), which Grandbouche founded and directed.  Grandbouche sued the IRS, asserting that it violated Grandbouche's First and Fourteenth Amendment rights by allegedly using the seized information to harass and intimidate NCBA's members.  As a result of the IRS's activities, Grandbouche contended, people left the membership of NCBA and failed to become members of the organization.

During discovery, the IRS requested, among other information, the membership and mailing lists of the NCBA for a five-year period.  In support of these discovery requests, the IRS stated that it needed the information sought to prepare their defense to Grandbouche's claim that people left or failed to join NCBA as a result of the IRS's alleged harassment.  The trial court ordered production of the requested materials, finding that the First Amendment right of association had no application to discovery orders in private litigation.

The Tenth Circuit, however, disagreed, noting that the court's compelling of discovery provided the requisite governmental action that invokes First Amendment scrutiny.  825 F.2d at 1466.  In remanding the matter to the trial court for, among other reasons, consideration of

Grandbouche's First Amendment privilege against the requested discovery, the Tenth Circuit instructed the trial court, "[T]he fact that Grandbouche has placed certain information into issue by his complaint is a factor that the trial court should consider . . . ." 825 F.2d at 1467.

Likewise, in *Nat'l Org. for Women*, *supra*, the National Organization for Women ("NOW") and an individual plaintiff sued on behalf of a class of employees and prospective employees who claimed to have been injured by the employment practices of the defendant, Sperry Univac Corporation ("Sperry"). Sperry moved to compel disclosure of the full membership list of NOW, arguing that it required the information to combat the claims of NOW that a number of its members were aggrieved by certain employment practices engaged in by Sperry. The court granted Sperry's motion to compel, noting that NOW had "assiduously pursued this action and it seeks substantial recovery from the defendant. . . . Fairness dictates that NOW, as a plaintiff, cannot realistically hope to pursue this suit in a risk-free atmosphere." 88 F.R.D. at 275. Although the court expressly recognized that NOW's members had not by bringing suit "completely sacrificed their privacy rights," *id.*, the court nevertheless found that, because of the nature of the claims NOW brought, Sperry was entitled to certain information regarding NOW's membership, in order to allow Sperry to defend the lawsuit against it. More specifically, the court required the disclosure of the name, sex, race, current address, and occupation of every member of the Farmington Valley Chapter of NOW who was a current or former employee of Sperry or who was or may be interested in seeking employment with Sperry.

*Southern Methodist Univ. Ass'n of Women Law Students*, *supra*, arrived at a similar result. In that case, four anonymous female lawyers alleged that the defendants, two Dallas law firms, discriminated against women in hiring summer law clerks and associates. The plaintiffs sought

injunctive relief. During discovery, the defendants requested, among other information, the identities of the officers and members of the Association's governing body in order to defend against the plaintiffs' claims. The trial court ordered the plaintiffs to produce the Association's current membership list and to answer certain interrogatories regarding the identities of the women whom the plaintiffs claimed were hesitant to join or work on behalf of the Association in public for fear that if associated with the Association, they would be singled out for discrimination by the defendants and other law firms.

On appeal, the Eleventh Circuit's predecessor court affirmed, with a modification limiting distribution of the membership information to the two named partners of the defendants' law firm, who, in turn, were forbidden from divulging the information to anyone else except by further order of the court. In reaching this conclusion, the Former Fifth Circuit stated, "we believe that this ruling strikes a sensible balance between [the defendants'] need to defend this lawsuit and the Association's desire to avoid the purportedly adverse consequences of revealing information with respect to its membership." 599 F.2d at 714.

Applying these principles to the case at hand, the Court finds that it similarly cannot simply ignore the fact that the Church has placed at issue the burden allegedly inflicted upon it by the Town's denial of its application. While the Court must take care not to make rulings that would penalize a plaintiff for exercising its constitutional rights, nor can the Court deprive a defendant of the ability to defend itself against an element of the plaintiff's claim against it. Consequently, here, where the Church alleges that the Town's actions have burdened the Church by refusing the Church's application, and thus, interfering with the Church's ability to conduct its desired religious programming because of a current lack of space, in order to defend itself, the Town must have the

means to investigate the Church's factual assertions in this regard.  Accordingly, this factor weighs in favor of the Town.

**5.**     ***Least Restrictive Means***

Finally, the Court must consider whether the Town's requested discovery constitutes the means least restrictive upon the Church and its members' First Amendment rights, for fulfilling the Town's compelling need for the information it seeks.  In making this determination, the Court concludes that narrowing the discovery requests somewhat, subjecting the responsive information to a protective order, and limiting the permissible areas of inquiry in follow-up questioning of Church members will accomplish the Town's purposes without unduly infringing upon the Church and its members' First Amendment rights.

Thus, because the Town really seeks information allowing it to test the Church's contentions that its current programming exceeds its existing spacial availability, the Court orders the Church to identify the names and contact information of all members who have attended Church programming where they have had to stand because of inadequate room for seating, or they have been denied admission as a result of a lack of necessary space.  Similarly, to the extent that the Church contends that funerals, weddings, or other individual events have had to be scheduled on dates other than the participants' first choices because of unsatisfactory space, the Church must provide the names and contact information of each member allegedly so affected.  This should give the Town the means required to allow the Town to investigate the Church's factual claims regarding the current burden imposed on the Church and its members' First Amendment rights by the Town's denial of the Church's application, without intruding any more than absolutely necessary into the Church and its members' First Amendment rights.

Additionally, the information provided by the Church in this regard shall be subject to a protective order and shall be disclosed to no one other than counsel for the Town until further order of the Court, and shall be used only for purposes of defending the Town in the instant litigation. Finally, in order to avoid unnecessary intrusion into the Church members' First Amendment rights, any questioning by the Town of Church members discovered as a result of this Order shall be limited to factual questions regarding the numbers of people in attendance at Church programming that the Church asserts were over-attended. The Town shall not inquire into the members' religious beliefs, as they are not relevant for the Town's asserted purposes underlying the discovery sought.

### *CONCLUSION*

For the foregoing reasons, the Town's Motion to Compel is **GRANTED IN PART and DENIED IN PART**, consistent with this Order.

**DONE AND ORDERED** this 29th day of June, 2008.

ROBIN S. ROSENBAUM
UNITED STATES MAGISTRATE JUDGE

cc:   Hon. William P. Dimitrouleas
      Counsel of Record